In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-8003

MOTOROLA MOBILITY LLC,

*Plaintiff-Appellant,*

*v.*

AU OPTRONICS CORP., *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 9 C 6610 — **Joan B. Gottschall**, *Judge.*

ARGUED NOVEMBER 13, 2014 — DECIDED NOVEMBER 26, 2014

Before POSNER, KANNE, and ROVNER, *Circuit Judges.*

POSNER, *Circuit Judge.* Back in March we granted the plaintiff's unopposed petition for leave to take an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) from an order granting partial summary judgment in favor of the defendants (which include Samsung, Sanyo, and several other foreign companies besides AU Optronics), thereby extinguishing most of the plaintiff's case. The district judge certified the order for an immediate appeal. We agreed to hear the appeal, and without asking for further briefing or oral ar-

gument affirmed the district court's decision in an opinion, reported at 746 F.3d 842 (7th Cir. 2014), that we later vacated, ordering rehearing and directing further briefing and oral argument, now complete. We have also granted several requests for permission to file amicus curiae briefs, including a brief from the Department of Justice and briefs from foreign countries worried about the implications of Motorola's suit for their own competition policies.

Motorola, the plaintiff-appellant, and its ten foreign subsidiaries, buy liquid-crystal display (LCD) panels and incorporate them into cellphones manufactured by Motorola or the subsidiaries. The suit accuses foreign manufacturers of the panels of having violated section 1 of the Sherman Act, 15 U.S.C. § 1, by agreeing with each other on the prices they would charge for the panels. Those manufacturers are the defendants-appellees.

This appeal does not concern all the allegedly price-fixed LCD panels. (We'll drop "allegedly" and "alleged," for simplicity, and assume that the panels were indeed price-fixed—a plausible assumption since defendant AU Optronics has been convicted of participating in a criminal conspiracy to fix the price of panel components of the cellphones manufactured by Motorola's foreign subsidiaries. *United States v. Hsiung*, 758 F.3d 1074 (9th Cir. 2014).) About 1 percent of the panels sold by the defendants to Motorola and its subsidiaries were bought by, and delivered to, Motorola in the United States for assembly here into cellphones; to the extent that the prices of the panels sold to Motorola had been elevated by collusive pricing by the manufacturers, Motorola has a solid claim under section 1 of the Sherman Act. The other 99 percent of the cartelized components, however,

were bought and paid for by, and delivered to, foreign sub-sidiaries (mainly Chinese and Singaporean) of Motorola. Forty-two percent of the panels were bought by the subsidi-aries and incorporated by them into cellphones that the sub-sidiaries then sold to and shipped to Motorola for resale in the United States. Motorola did none of the manufacturing or assembly of these phones. The sale of the panels to these subsidiaries is the focus of this appeal.

Another 57 percent of the panels, also bought by Motorola's foreign subsidiaries, were incorporated into cell-phones abroad and sold abroad. As neither those cellphones nor their panel components entered the United States, they never became a part of domestic U.S. commerce, see 15 U.S.C. § 6a, and so, as we're about to see, can't possibly sup-port a Sherman Act claim.

Motorola says that *it* "purchased over $5 billion worth of LCD panels from cartel members [i.e., the defendants] for use in its mobile devices." That's a critical misstatement. All but 1 percent of the purchases were made by Motorola's for-eign subsidiaries. The subsidiaries are not Motorola; they are owned by Motorola. Motorola and its subsidiaries do not, as it argues in its opening brief, function "as a 'single enter-prise.'" And from this we can begin to see the oddity of this case. If a firm is injured by unlawful acts of other firms, the firm may have a cause of action against the injurers but the firm's owner does not. The victims of the price fixing of LCD panels were Motorola's foreign subsidiaries. Motorola itself, along with U.S. purchasers of cellphones incorporating those panels, were at most derivative victims.

The district judge ruled that Motorola's suit, insofar as it relates to the 99 percent of panels purchased by the foreign

subsidiaries, is barred by 15 U.S.C. §§ 6a(1)(A), (2), which are sections of the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a. That act that has been interpreted, for reasons of international comity (that is, good relations among nations), to limit the extraterritorial application of U.S. antitrust law. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 273c2 (3d ed. 2006). Sections 6a(1)(A) and (2) provide that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless … such conduct has a direct, substantial, and reasonably foreseeable effect … on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations," and also, in either case, unless the "effect [on import trade or domestic commerce] gives rise to a claim" under federal antitrust law. See, e.g., *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161–62 (2004); *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 853–54 (7th Cir. 2012) (en banc).

It is essential to understand that these are two requirements. There must be a direct, substantial, and reasonably foreseeable effect on U.S. domestic commerce—the domestic American economy, in other words—*and* the effect must give rise to a federal antitrust claim. The first requirement, if proved, establishes that there is an antitrust violation; the second determines who may bring a suit based on it.

Had the defendants conspired to sell LCD panels to Motorola in the United States at inflated prices, they would be subject to the Sherman Act because of the exception in the Foreign Trade Antitrust Improvements Act for importing.

That is the 1 percent, which is not involved in the appeal. Regarding the 42 percent, Motorola is wrong to argue that it is import commerce. It was Motorola, rather than the defendants, that imported these panels into the United States, as components of the cellphones that its foreign subsidiaries manufactured abroad and sold and shipped to it. So it first must show that the defendants' price fixing of the panels that they sold abroad and that became components of cellphones also made abroad but imported by Motorola into the United States had "a direct, substantial, and reasonably foreseeable effect" on commerce within the United States. The panels—57 percent of the total—that never entered the United States neither affected domestic U.S. commerce nor gave rise to a cause of action under the Sherman Act.

If the prices of the components were indeed fixed, there would be an effect on domestic U.S. commerce. And that effect would be foreseeable (because the defendants knew that Motorola's foreign subsidiaries intended to incorporate some of the panels into products that Motorola would resell in the United States), could be substantial, and might well be direct rather than "remote," the term we used in *Minn-Chem, Inc. v. Agrium, Inc.*, *supra*, 683 F.3d at 856–57, to denote effects that the statutory requirement of directness excludes.

The price fixers had, it is true, been selling the panels not in the United States but abroad, to foreign companies (the Motorola subsidiaries) that incorporated them into cellphones that the foreign companies then exported to the United States for resale by the parent company, Motorola. The effect of fixing the price of a component on the price of the final product was therefore less direct than the conduct in *Minn-Chem*, where "foreign sellers allegedly created a car-

tel, took steps outside the United States to drive the price up of a product that is wanted in the United States, and then (after succeeding in doing so) *sold that product to U.S. customers.*" *Id.* at 860 (emphasis added). But at the same time the facts of this case are not equivalent to what we said in *Minn-Chem* would *definitely* block liability under the Sherman Act: the "situation in which action in a foreign country filters through many layers and finally causes a few ripples in the United States." *Id.* In this case components were sold by their manufacturers to the foreign subsidiaries, which incorporated them into the finished product and sold the finished product to Motorola for resale in the United States. This doesn't seem like "many layers," resulting in just "a few ripples" in the United States cellphone market, though, as we'll see, the ripple effect probably was modest. We'll assume that the requirement of a direct, substantial, and reasonably foreseeable effect on domestic commerce has been satisfied, as in *Minn-Chem* and *Lotes Co. v. Hon Hai Precision Industry Co.*, 753 F.3d 395, 409–13 (2d Cir. 2014).

What trips up Motorola's suit is the statutory requirement that the effect of anticompetitive conduct on domestic U.S. commerce give rise to an antitrust cause of action. 15 U.S.C. § 6a(2). The conduct increased the cost to Motorola of the cellphones that it bought from its foreign subsidiaries, but the cartel-engendered price increase in the components and in the price of cellphones that incorporated them occurred entirely in foreign commerce.

We have both direct purchasers—Motorola's foreign subsidiaries—from the price fixers, and two tiers of indirect purchasers: Motorola, insofar as the foreign subsidiaries passed on some or all of the increased cost of components to

Motorola, and Motorola's cellphone customers, insofar as Motorola raised the resale price of its cellphones in an attempt to offload the damage to it from the price fixing to its customers. According to Motorola's damages expert, B. Douglas Bernheim, the company raised the price of its cellphones in the United States by *more* than the increased price charged to it by its foreign subsidiaries. We have no information about whether Motorola lost customers as a result— it may not have, if other cellphone sellers raised their prices as well. Perhaps because Motorola may actually have profited from the price fixing of the LCD panels, it has waived any claim that the price fixing affected the price that Motorola's foreign subsidiaries charged, or were told by Motorola to charge, for the cellphones that they sold their parent. (We'll come back to the issue of waiver.)

Whether or not Motorola was harmed indirectly, the immediate victims of the price fixing were its foreign subsidiaries, see *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, *supra*, 542 U.S. at 173–75, and as we said in the *Minn-Chem* case, "U.S. antitrust laws are not to be used for injury to foreign customers," 683 F.3d at 858. Motorola's subsidiaries are governed by the laws of the countries in which they are incorporated and operate; and "a corporation is not entitled to establish and use its affiliates' separate legal existence for some purposes, yet have their separate corporate existence disregarded for its own benefit against third parties." *Disenos Artisticos E Industriales, S.A. v. Costco Wholesale Corp.*, 97 F.3d 377, 380 (9th Cir. 1996). For example, although for antitrust purposes Motorola contends that it and its subsidiaries are one (the "it" we referred to earlier), for tax purposes its subsidiaries are distinct entities paying foreign rather than U.S. taxes.

Distinct in *uno*, distinct in *omnibus*. Having submitted to foreign law, the subsidiaries must seek relief for restraints of trade under the law either of the countries in which they are incorporated or do business or the countries in which their victimizers are incorporated or do business. The parent has no right to seek relief on their behalf in the United States.

Derivative injury rarely gives rise to a claim under anti-trust law, for example by an owner or employee of, or an investor in, a company that was the target of, and was injured by, an antitrust violation. *Mid-State Fertilizer Co. v. Exchange National Bank of Chicago*, 877 F.2d 1333, 1335–36 (7th Cir. 1989); see generally *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477 (1977). Those derivative victims are said to lack "antitrust standing." Often, as in the example just given, their claims would be redundant, because if the direct victim received full compensation there would be no injury to the owner, employee, or investor—he or it would probably be as well off as if the antitrust violation had never occurred. If Motorola's foreign subsidiaries have been injured by violations of the antitrust laws of the countries in which they are domiciled, they have remedies; if the remedies are inadequate, or if the countries don't have or don't enforce antitrust laws, these are consequences that Motorola committed to accept by deciding to create subsidiaries that would be governed by the laws of those countries. (An important, and highly relevant, application of the concept of "antitrust standing" is the indirect-purchaser doctrine of the *Illinois Brick* case, discussed below.)

No doubt Motorola thinks U.S. antitrust remedies more fearsome than those available to its foreign subsidiaries under foreign laws. But that's just to say that Motorola is asserting a right to forum shop. Should some foreign country

in which one of its subsidiaries operates have stronger anti-trust remedies than the United States does, Motorola would tell that subsidiary to sue under the antitrust law of that country.

A related flaw in Motorola's case is its collision with the indirect-purchaser doctrine of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), which forbids a customer of the purchaser who paid a cartel price to sue the cartelist, even if his seller—the direct purchaser from the cartelist—passed on to him some or even all of the cartel's elevated price. Motorola's subsidiaries were the direct purchasers of the price-fixed LCD panels, Motorola and its customers indirect purchasers of the panels. Confusingly, at the oral argument Motorola's able counsel stated his approval of the *Illinois Brick* doctrine, yet Motorola's briefs assert, albeit without any basis that we can see, that the Foreign Trade Antitrust Improvements Act, because it does not mention *Illinois Brick* (or the indirect-purchaser doctrine, announced in that case), is not subject to it.

Because it is difficult to assess the impact of a price in-crease at one level of distribution on prices and profits at a subsequent level, and thus to apportion damages between direct and indirect (i.e., subsequent) purchasers (here, be-tween Motorola's subsidiaries, Motorola the parent, and Motorola's cellphone customers), the indirect-purchaser doc-trine cuts off analysis at the first level. This may result in a windfall for the direct purchaser, but preserves the deterrent effect of antitrust damages liability while eliding complex issues of apportionment. In this case the first sale was to a foreign subsidiary of Motorola that could sue the price fixers under the law of the country of which the subsidiary was a

citizen, or the law of the countries of which the price fixers were citizens (or a country of which a particular price fixer that the subsidiary decided to sue was a citizen). Motorola, the American parent, the harm to which from the price fixing would be so difficult to estimate, could not sue under federal antitrust law.

Speaking of that difficulty of estimating harm to Motorola, we point out that although this suit is more than five years old there is a remarkable dearth of evidence from which to infer actual harm to Motorola. Its briefs lack the numbers one would need to infer, let alone to quantify, such harm. But the report of Motorola's expert witness on damages, B. Douglas Bernheim, provides a basis for informed speculation. Suppose hypothetically that a cellphone costs a Motorola foreign subsidiary $100 to manufacture, and the subsidiary sells it to Motorola for $120 to cover the costs of assembling the components that go to make up the cellphone, and of shipment. Motorola in turn resells the cellphone to American consumers for $150. One of the components costs the subsidiary $10 (10 percent of the total cost of the cellphone—this appears to be an approximately accurate estimate for the LCD panels installed in the cellphones). The manufacturers of that component form a cartel and raise the price to $12, a 20 percent increase. Now the cost of making the cellphone is $102, and to reflect this cost increase Motorola could be expected to direct the subsidiary to raise its price to Motorola from $120 to, say, $122. What would Motorola do next? It would like to maintain its profit margin, and so we might expect it to raise its resale price—the price of its cellphones to the American consumer—from $150 to $152. That would be only a 1.33 percent increase. Would Motorola lose sales and therefore profits? Who knows? The

price increase is tiny, and competitors might think it more profitable to match it than to undercut it; they might think their sales would not fall appreciably and that their profit margins would be slightly higher. This would be an example of tacit collusion, which is not an antitrust violation.

It is uncertainties like these that confirm the wisdom of the indirect-purchaser doctrine of *Illinois Brick*.

Motorola claims that it told the subsidiaries how much they could pay the cartel sellers for the panels—that its subsidiaries "issued purchase orders at the price and quantity determined by Motorola in the United States" and that therefore Motorola was the real buyer of the panels and so the panels were really imported directly into the United States rather than being sold abroad to the subsidiaries. In other words, Motorola is pretending that its foreign subsidiaries are divisions rather than subsidiaries. But Motorola can't just ignore its corporate structure whenever it's in its interests to do so. Motorola's foreign subsidiaries, the direct purchasers from the makers of the panels, are legally distinct foreign entities and Motorola cannot impute to itself the harm suffered by them.

Motorola insists that it was the "target" of the price fixers—that they "integrated themselves into the design of Motorola's U.S. products, and intentionally manipulated Motorola's price negotiations by illegally exchanging Motorola-specific information." But this is just inflated rhetoric used to describe, what is obvious, that firms engaged in the price fixing of a component are critically interested in the market demand for the finished product—knowledge of that demand is essential to deciding on the optimal price of the component. If the price fixers are too greedy and fix a very

high price for the component, this may result in so high a price for the finished product that the sales of that product will fall and with it the purchases of the component and quite possibly the profits of the price fixers.

Motorola's "target" theory of antitrust liability would nullify the doctrine of *Illinois Brick*, for we've just seen that in deciding how much to charge the direct purchaser a cartel would always want to estimate the price at which the direct purchaser would resell in order to capture some or all of the resale profits. There is nothing unusual about firms' trying to pass on cost increases to their buyers; the buyers are hurt but as long as *Illinois Brick* is the law their hurt doesn't give them an antitrust case of action. Thus in asking us not to "ignore the injuries defendants knowingly caused to Motorola's U.S. business through their deliveries abroad," Motorola ignores the fact that a cartel almost always *knowingly* causes injury to indirect purchasers, yet those purchasers are barred from suit by *Illinois Brick* and the doctrine of antitrust standing that the rule of that case instantiates.

It's true that the opinion in *Illinois Brick* states that a "situation in which market forces have been superseded and the pass-on defense might be permitted is where the direct purchaser is owned or controlled by its customer." *Id*. at 736 n. 16. But "might be" is not "is," and the distinction is significant in this case. Although Motorola, the "customer," owns its foreign subsidiaries—the "direct purchasers" of the components—they are incorporated under and regulated by foreign law. What remedies they may have, if they overpay for inputs that they buy abroad, are determined not by U.S. antitrust law but by the law of the countries in which the subsidiaries are incorporated and are therefore citizens of, or the

countries in which the price fixers they bought from operate, or the countries in which the purchases were made. And that is quite apart from *Illinois Brick* or other sources of U.S. antitrust law

But supposing this is wrong and Motorola is correct that it and its subsidiaries "are one", there was no sale by the subsidiaries to Motorola. Instead the component manufacturers (the price fixers) sold components to "the one," which assembled them into cellphones, and "the one" sold the cellphones to U.S. consumers. The sales to consumers would therefore have been the first sales in the United States—the first in domestic commerce, since "the one" bought the price-fixed components abroad. Remember that the Foreign Trade Antitrust Improvements Act requires that the effect of an anticompetitive practice on domestic U.S. commerce must, to be subject to the Sherman Act, give rise to an antitrust cause of action. "The one" (Motorola and its foreign subsidiaries conceived of as a single entity) would have been injured abroad when "it" purchased the price-fixed components.

Motorola makes a last attempt to wiggle out from under *Illinois Brick* by arguing that there should be an exception to the indirect-purchaser doctrine for any case in which applying the doctrine would prevent any American company from suing. But Motorola insists that it dictates the price at which it buys cellphones from its subsidiaries, and it would be odd to think that Motorola could obtain antitrust damages on the basis of its own pricing decisions.

In any event Motorola waived in the district court any argument that it could base damages on the effect of the cartel's pricing of components on the cost to Motorola of cell-

phones incorporating those components. It argued only that its foreign subsidiaries overpaid for the LCD panels. How the overcharge may have affected Motorola's cellphone business because of the component price fixing was a path that Motorola stepped off of after the pleadings. Its *complaint* alleged that it paid more for cellphones that it purchased from its subsidiaries, but it then dropped the point in favor of arguing (as it did for example in a brief opposing summary judgment) that "this 'effect'—the approval of a single, artificially-inflated LCD panel price in the United States—proximately caused all of Motorola's damages, because that same artificially-inflated price applied wherever and whenever a Motorola facility placed a purchase order and paid for a panel." But Motorola's damages expert, Bernheim, discussed only the damages that Motorola's foreign subsidiaries incurred from having to overpay for LCD panels. He made no attempt to estimate the increase in the price paid by Motorola for finished cellphones. Motorola even refused to respond to one of the defendants' requests for an admission by saying: "Motorola is not basing its claims on the purchase of finished LCD Products [i.e., cellphones]."

There is still more that is wrong with Motorola's case. Nothing is more common nowadays than for products imported to the United States to include components that the producers bought from foreign manufacturers. See Gregory Tassey, "Competing in Advanced Manufacturing: The Need for Improved Growth Models and Policies," *Journal of Economic Perspectives*, vol. 28, no. 1, Winter 2014, p. 27, 31–35; Dick K. Nanto, "Globalized Supply Chains and U.S. Policy," Congressional Research Service (Jan. 27, 2010), http://assets.opencrs.com/rpts/R40167_20100127.pdf. Even Motorola acknowledges "that a substantial percentage of U.S. manu-

facturers utilize global supply chains and foreign subsidiaries to effectively compete in the global economy." Some of those foreign manufacturers are located in countries that do not have or, more commonly, do not enforce antitrust laws consistently or uniformly, or whose antitrust laws are more lenient than ours, especially when it comes to remedies, notably punitive damages (such as the treble-damages antitrust remedy authorized by section 4 of the Clayton Act, 15 U.S.C. § 15). As a result, the prices of many products exported to the United States doubtless are elevated to some extent by price fixing or other anticompetitive acts that would be forbidden by the Sherman Act if committed in the United States. Motorola argues that "the district court's ruling would allow foreign cartelists to come to the United States" and "unfairly overcharge U.S. manufacturers." Not true; the defendants did not sell in the United States and, if they were overcharging, they were overcharging other foreign manufacturers—the Motorola subsidiaries.

The Supreme Court has warned that rampant extraterritorial application of U.S. law "creates a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, *supra*, 542 U.S. at 165. The Foreign Trade Antitrust Improvements Act has been interpreted to prevent such "unreasonable interference with the sovereign authority of other nations." *Id*. at 164. The position for which Motorola contends would if adopted enormously increase the global reach of the Sherman Act, creating friction with many foreign countries and "resent[ment at] the apparent effort of the United States to act as the world's competition police officer," a primary concern motivating the Foreign Trade Antitrust Improvements Act. *United Phosphorus, Ltd. v.*

*Angus Chemical Co.*, 322 F.3d 942, 960–62 (7th Cir. 2003) (en banc) (dissenting opinion), overruled on other grounds by *Minn-Chem, Inc. v. Agrium, Inc.*, *supra*. It is a concern to which Motorola is—albeit for understandable financial reasons—oblivious.

Motorola's foreign subsidiaries were injured in foreign commerce—in dealings with other foreign companies—and to give Motorola rights to take the place of its foreign companies and sue on their behalf under U.S. antitrust law would be an unjustified interference with the right of foreign nations to regulate their own economies. The foreign subsidiaries can sue under foreign law—are we to *presume* the inadequacy of the antitrust laws of our foreign allies? Would such a presumption be consistent with international comity, or more concretely with good relations with allied nations in a world in turmoil? To quote from the *Empagran* opinion again, "Why should American law supplant, for example, Canada's or Great Britain's or Japan's own determination about how best to protect Canadian or British or Japanese customers from anticompetitive conduct engaged in significant part by Canadian or British or Japanese or other foreign companies?" 542 U.S. at 165.

So Motorola's suit has no merit, but it remains to note the amicus curiae brief filed by the Justice Department with endorsements by officials from the FTC, the State Department, and the Department of Commerce. Although an earlier such brief had urged us to vacate our original decision (which we did), and we assumed the Department wanted us to reverse the district court's grant of partial summary judgment in favor of the defendants, there is no such contention in its present brief. It asks us only to "hold that the conspiracy to fix

the price of LCD panels had a direct, substantial, and reasonably foreseeable effect on U.S. import and domestic commerce in cellphones incorporating these panels." The brief argues that the criminal and injunctive provisions of the Sherman Act, which of course are provisions that the Justice Department enforces, are applicable to the conduct of the defendants. The brief is less than sanguine on whether Motorola can obtain damages. The indirect-purchaser doctrine is applicable only to damages suits, and the brief disclaims taking any position on the applicability of the doctrine to this case. It goes so far as to say that "permitting Motorola to recover on all its claims because it purchased some panels in import commerce would allow recovery for independently caused foreign injuries on the basis of happenstance."

All that the government wants from us is a disclaimer that a ruling against Motorola would interfere with criminal and injunctive remedies sought by the government against antitrust violations by foreign companies. The government's concern relates to the requirement of the Foreign Trade Antitrust Improvements Act that foreign anticompetitive conduct have a direct, substantial, and reasonably foreseeable effect on domestic U.S. commerce to be actionable under the Sherman Act. If price fixing by the component manufacturers had the requisite statutory effect on cellphone prices in the United States, the Act would not block the Department of Justice from seeking criminal or injunctive remedies. Indeed, we noted earlier that the Department successfully prosecuted AU Optronics for criminal price-fixing of the LCD panels sold to Motorola's foreign subsidiaries. But the Department does not suggest that the defendants' conduct gave rise to an antitrust damages remedy for Motorola.

Motorola has lost its best friend.

That's something of a surprise but a bigger surprise, given that representatives of the State and Commerce Departments have signed on to the Justice Department's brief, is the absence of any but glancing references to the concerns that our foreign allies have expressed with rampant extraterritorial enforcement of our antitrust laws. We asked the government's lawyer at the oral argument about those concerns, and he replied that the Justice Department has worked out a modus vivendi with foreign countries regarding the Department's antitrust proceedings against foreign companies. We have no reason to doubt this. Again private damages actions went unmentioned.

A recent article about Motorola's suit notes the problems with private antitrust suits of this kind. It points out that "virtually every product sold in the United States has some foreign-made component," implying an enormous potential for suits of this character should Motorola prevail, and noting too that "the U.S. government has reason to weigh comity and sovereignty concerns when bringing international component cartel case[s]," but "private plaintiffs do not." Robert Connolly, "Motorola Mobility and the FTAIA," *Cartel Capers* (Sept. 30, 2014), http://cartel capers.com/blog/motorola-mobility-ftaia. And Motorola has "only" 10 foreign subsidiaries. General Motors has 26. Walmart has 27. Exxon has 122. The mind boggles at the thought of the number of antitrust suits that major American corporations could file against the multitudinous suppliers of their prolific foreign subsidiaries if Motorola had its way. Given the further complications introduced by the *Illinois Brick* doctrine, limited however to damages suits, there is

much to be said for the approach—skeptical of Motorola's suit but emphatic in asserting the government's power to obtain relief through criminal and injunctive actions without ruffling our allies' feathers—argued by Connolly and the government's amicus curiae brief.

Connolly amplifies his analysis in another recent article, "Repeal the FTAIA! (Or at Least Consider It as Coextensive with *Hartford Fire*)," *CPI Antitrust Chronicle* (Sept. 2014), www.competitionpolicyinternational.com/repeal-the-ftaia-or-at-least-consider-it-as-coextensive-with-hartford-fire/. As is apparent from the title, the article ranges far beyond the issues in our case. But the article does discuss the case at some length, offering (at pp. 3–7) a number of pertinent observations, particularly concerning the differences between a private damages suit and a government suit seeking criminal or injunctive remedies:

> As the government notes in its amicus filings, there is a difference between actions brought by the DOJ and private class action damages. *Motorola Mobility* can be decided in such [a] way as to recognize these differences. The court can find jurisdiction under the FTAIA for DOJ prosecutions while addressing the concerns raised by China, Japan, Korea, and Taiwan about an unduly expansive application of U.S. law [that] they claim would undermine principles of international comity. … Finding jurisdiction for the United States to prosecute component price-fixing need not ignore the international comity concerns of foreign governments. No nation has objected to the DOJ's successful prosecution of foreign companies and even citizens of that country in the LCD panel investigation. As the United States notes in its brief, the DOJ seriously considers the views of foreign nations before bringing cases. … [T]he comity considerations with private plaintiffs are quite dif-

ferent. "[P]rivate plaintiffs … often are unwilling to exercise the degree of self-restraint and consideration of foreign governmental sensibilities generally exercised by the U.S. Government." [citing *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, *supra*, 542 U.S. at 171, quoting Joseph P. Griffin, "Extraterritoriality in U.S. and EU Antitrust Enforcement," 67 *Antitrust L.J.* 159, 194 (1999)] …

It is fair to require foreign subsidiaries of American companies to seek remedy in the courts of the country in which they choose to incorporate. Companies operate overseas facilities to take advantage of many legal provisions of that country: labor law, environmental law, and tax law. In non-legal terms: "You take the good with the bad." By contrast, American consumers have no realistic choice but to buy finished goods that are assembled from components sold and assembled around the world. Therefore, the antitrust laws should be read—where possible—to allow governmental enforcement against international cartels that were meant to have, and have had, a substantial effect[] on domestic commerce. … A foreign subsidiar[y's]  position is more akin to an American citizen living overseas who buys price-fixed goods but then must seek any remedies under the laws [of the] country she has chosen to live in. …

Domestic corporate purchasers are not without remedy when buying component parts from foreign vendors. First, the U.S. parent could buy directly from the foreign vendor and preserve the right to sue as a direct purchaser (while trading off the benefits the company gained from operating through a foreign subsidiary). Or, if a U.S. parent doesn't think that antitrust laws are sufficiently, or fairly, enforced in a given country, they certainly don't have to set up a subsidiary there. … So, an adverse ruling in *Motorola* would not eliminate every avenue of damage re-

dress for component price-fixing. … The *Motorola Mobility* court should reach a decision that preserves the ability of the DOJ to protect American consumers and continue to lead the way in prosecuting international cartels—including appropriate component cartels. The court could also acknowledge the comity concerns of foreign nations and find application of *Illinois Brick* a bar to foreign component civil damage cases.

The district court's grant of partial summary judgment in favor of the defendants is

                                                                              AFFIRMED.